IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil No. 1:05-cv-11421-RCL |
| | ) | |
| JOSEPH MOUJABBER, executor of the | ) | |
| Estate of Douglas Abdelnour, | ) | |
| | ) | |
| Defendant. | ) | |

UNITED STATES' OPPOSITION TO JUDGMENT DEBTOR JOSEPH MOUJABBER'S
MOTION FOR PROTECTIVE ORDER

The plaintiff and judgment creditor United States of America, by and through its

undersigned counsel, hereby opposes judgment debtor Joseph Moujabber's motion for a

protective order against a subpoena duces tecum served on Edgartown National Bank, the

institution holding a bank account in the name of a corporation owned by the judgment debtor.

The subpoena is attached as Exhibit A hereto.

**Statement of Facts**

Douglas Abdelnour failed to pay his 1992 and 1993 federal income taxes.  As a result,

the I.R.S. made assessments against Abdelnour for the 1992 and 1993 tax years on May 24,

1993, and March 28, 1996, respectively.  Each of those assessments created a lien on all of

Abdelnour's property as of those dates. [Dkt. # 1, Complaint ¶¶ 4-5]

On July 7, 2005, the United States filed suit against Abdelnour, seeking to reduce his

1992 and 1993 income tax liabilities to judgment, in the approximate amount of $688,000, plus

interest and penalties. [Dkt. #1]

- 2 -

After the United States' Complaint was filed, Abdelnour's attorney filed a suggestion of his client's death, and this Court granted a motion to substitute Joseph Moujabber, executor of Abdelnour's estate, as the defendant. [Dkt. #6]

On August 22, 2006, the Court entered an Agreed Judgment against Moujabber (as executor for Abdelnour's estate)  for the full amount demanded in the Complaint, plus statutory additions and interest. [Dkt. # 15]

After entry of judgment, the United States, as judgment creditor, conducted discovery in aid of execution of its money judgment as permitted by Rule 69 of the Federal Rules of Civil Procedure, including a deposition of Moujabber.  Among other things, this discovery shows:

• Abdelnour founded, and until sometime in the early 1990s was the president and sole shareholder of, Douglas Island Development Corporation ("DID"). Moujabber Dep. 24. DID's main business is a restaurant on Martha's Vineyard called Nancy's Restaurant. The going concern value of Nancy's Restaurant is estimated at about $3.5 million. Moujabber Dep. 60.

• At all relevant times, DID has maintained a bank account with Edgartown National Bank, where Abdelnour also maintained a personal bank account.[1]  Moujabber Dep. 52-53. 88.

• Abdelnour encountered financial difficulties in the early 1990s.  Among other things, he incurred the federal income tax liabilities for which the United States has obtained a judgment in this action.  Moujabber Dep. 86-87; Complaint ¶4-5.

---

[1]  The United States' subpoena to Edgartown National Bank also requested records from Abdelnour's personal account.  Moujabber apparently does not contest that aspect of the subpoena.

- 3 -

- In this general time frame, Abdelnour transferred his entire ownership interest in DID to Moujabber.[2]  Moujabber paid no consideration in exchange for the stock of DID. Moujabber Dep. 24, 34.

- At about the same time, Abdelnour transferred his beneficial interest in several trusts to Moujabber without consideration.  Among those trusts were the H&B Family Realty Trust and the Abdelnour RealtyTrust, each of which held record title to property used by DID/Nancy's Restaurant.  Moujabber Dep. 20

- These and other transfers denuded Abdelnour of any meaningful assets in the same time frame that Abdelnour was failing to pay his federal income taxes.

- After these transfers of assets to Moujabber, Abdelnour lived rent free for at least part of every year in an apartment on 10 Upper Douglas Lane, Oak Bluffs, Massachusetts (in a building that serves as a warehouse used by DID/Nancy's Restaurant).  The mortgage payments and maintenance expenses for this property were paid, not by Abdelnour, but by DID or Moujabber.  Moujabber Dep. 48, 62.

- Throughout this period and until his death Abdelnour continued to hold himself out to the public as the owner of DID, and even represented himself to be the owner of DID in public hearings with local government bodies regarding zoning disputes.  Moujabber Dep. 70-71.

---

[2]  Moujabber's counsel has asserted in its motion that DID's stock was transferred to Moujabber on June 28, 1992. This assertion clashes with Abdelnour's 2004 will, which specifically includes DID stock among the assets to be distributed from his estate, 12 years after he allegedly transferred all of that stock to Moujabber.  The United States has requested documents concerning this issue but to date Moujabber has not produced such documents.

- 4 -

- In August 2004, Abdelnour executed a will and testament that included a disposition of "all . . . shares of stock in [DID] and Nancy's Restaurant" and assigned the proceeds of sale of that stock to Moujabber  This is the will that was in effect at Abdelnour's death in 2006. Moujabber Dep. 68;  Exhibit B (Last Will and Testament).

- After Abdelnour's death, the Massachusetts Probate Court decreed that Abdelnour's estate is insolvent, leaving no assets in Abdelnour's name against which the United States may execute its judgment. [Dkt. #16]

Based on these facts, the United States sought further discovery regarding the relationship between Abdelnour, Moujabber, and DID.  As part of this investigation, the United States issued a subpoena to the Bank for DID's bank records.  The Bank has raised no objection to the subpoena and has indicated its willingness to comply once this motion is resolved.

## Argument

Rule 69 of the Federal Rules of Civil Procedure gives judgment creditors broad discovery rights in order to find assets against which to collect judgments.  This power extends not just to discovery directed at the judgment debtor, but also discovery directed to other potential sources of information regarding the judgment debtor's assets.  To conduct such discovery, a judgment creditor need only make a threshhold showing that there is a relationship between the judgment debtor and the third party and that the requested discovery is tailored to discover hidden assets or fraudulent transfers of the judgment debtor.  Caisson Corp. v. County West Building Corp., 62 F.R.D. 331, 335 (E.D. Pa. 1974).

The United States has established a reasonable basis for pursuing discovery regarding DID's finances.  The facts described above support the conclusion that Abdelnour exercised

3078501.1

- 5 -

control over, and enjoyed the benefits of ownership of, DID despite the alleged (nominal)

transfer of DID's stock to Moujabber.  Further, either shortly before or after Abdelnour incurred

his federal tax liabilities, he transferred ownership of DID to Moujabber under circumstances

that suggest an intent to shield assets from Abdelnour's creditors (including the I.R.S.)  That

transfer was part of a pattern of transfers in a short time frame that seem to have left Abdelnour

insolvent.

DID's bank records are directly relevant to this inquiry.  Among other things, the

subpoenaed documents may show that DID has spent corporate funds to pay Abdelnour's

personal expenses.  They may also indicate that Abdelnour had direct control over DID's

finances after the purported transfer of DID's stock.  Finally, the subpoenaed documents may

include deposits from, or withdrawals to, other entities or accounts affiliated with Abdelnour,

providing additional avenues for the United States' collection efforts.

In short, the United States has met its threshold showing for pursuing discovery as to

DID's bank records, based on Abdelnour's relationship with DID and the suspicious

circumstances surrounding Abdelnour's transfer of ownership of DID.  Moujabber raises no

meaningful argument to the contrary in his motion.  To the contrary, Moujabber merely asserts

that Abdelnour transferred his stock in DID to Moujabber, without addressing whether there is a

basis for the United States to seek discovery as to the circumstances surrounding that transfer, if

in fact it occurred.

- 6 -

## Conclusion

Accordingly, the United States respectfully requests that this Court deny Judgment

Debtor Moujabber's motion for a protective order.


I hereby certify that this document filed
through the ECF system will be sent
electronically to the registered participants
as identified on the Notice of Electronic
Filing (NEF) and paper copies will be sent to
those indicated as non registered
participants on 3/7/08
/s/ Robert J. Kovacev

Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney


BARBARA HEALY SMITH
Assistant United States Attorney


/s/ Robert J. Kovacev
ROBERT J. KOVACEV
Trial Attorney, Tax Division
U.S. Department of Justice
Post Office Box 55, Ben Franklin Station
Washington, D.C.  20044
Telephone: (202) 307-6541
Robert.J.Kovacev@usdoj.gov

3078501.1

AO88 (Rev. 12/07) Subpoena in a Civil Case

## Issued by the
# UNITED STATES DISTRICT COURT

---      DISTRICT OF      MASSACHUSETTS

UNITED STATES OF AMERICA

V.

JOSEPH MOUJABBER

### SUBPOENA IN A CIVIL CASE

Case Number:[1]   1:05cv11421

TO: Edgartown National Bank
    c/o Felding Moore
    2 South Water Street
    Edgartown, MA 02539

☐ YOU ARE COMMANDED to appear in the United States District court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
|  | DATE AND TIME |

☐ YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|

☒ YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):

See Attachment A

| PLACE   United States Attorney's Office, John Joseph Moakley Federal Courthouse, One Courthouse Way, Suite 9200, Boston, MA 02210 | DATE AND TIME   2/22/08   9:00 am |
|---|---|

☐ YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER'S SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE 2/07/08 |
|---|---|

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER
Robert J. Kovacev, Esq., United States Department of Justice, Tax Division, P.O. Box 55, Benjamin Franklin Station, Washington, DC 20044 (202) 307-6541

(See Rule 45, Federal Rules of Civil Procedure, Subdivisions (c), (d), and (e), on next page)

[1] If action is pending in district other than district of issuance, state district under case number.



GOVERNMENT
EXHIBIT

A

## Attachment A

All documents, including without limitation cancelled checks, deposit slips, withdrawal slips, ATM records, account statements, loan applications, and other transaction records, relating to the following accounts and created or modified at any time from 1990 to the present:

a)   any accounts (loan, credit, deposit, checking or any other kind) in the name of Douglas Island Development Corporation

b)   any accounts (loan, credit, deposit, checking or any other kind) in the name of Douglas Abdelnour

c)   any other accounts (loan, credit, deposit, checking or any other kind) in which Douglas Abdenlour has ever had any control or signing authority, either personally or as an agent for a corporation, partnership, trust, or other entity or person)

Please note that if a transaction indicates the purchase of a bank check, cashier's check, money order, or similar instrument, you must also provide a copy of the back of such instrument show the institution at which it was negotiated. Similarly, any wire transfer records must include documents sufficient to show the transferee information (institution and account number).

3034849.1

3

***Last Will and Testament***

*of*

## DOUGLAS A. ABDELNOUR

I, DOUGLAS A. ABDELNOUR, of Oak Bluffs, in the County of Dukes, and the Commonwealth of Massachusetts, do make, publish and declare this to be my Last Will and Testament, hereby revoking all Wills and Codicils heretofore made by me and intending hereby to execute any powers of appointment which I may have at the time of my decease.

***FIRST:***    I direct my Executor (which term includes Executrix), to pay all my just debts, funeral expenses and expenses of administration.

***SECOND:***    I direct my Executor to collect all of the my interests in real property, shares of stock in Douglas Island Development, Inc. and Nancy's Restaurant, if any, and to sell said interests to any person, company, corporation, and/or entity willing to purchase same for the fair market value, excepting that I specifically and unconditionally prohibit the Executor from selling and/or transferring said interests to my son, Douglas A. Abdelnour, Jr. and/or my former wife, Bonnie Barrow or any entity in which either and/or both of them have any interest. I further direct my Executor to pay the proceeds from said sale to Joseph G. Moujabber.

***THIRD:***    I give, devise and bequeath all the rest, residue and remainder of my property, real or personal and wherever situated to, JOSEPH G. MOUJABBER of Oak Bluffs, MA.

***FOURTH***:    Except to the extent to which I have included them in the provisions of this Will, I have intentionally, and not as a result of any accident, mistake, or inadvertence, omitted in this Will to provide for any of my issue now living or for any issue of mine hereafter born or adopted, or for any past or present spouse of mine now living.

***FIFTH:***    I nominate and appoint, JOSEPH G. MOUJABBER of Oak Bluffs, MA to be Executor of this Will. No Executor, Executrix, Administrator or Trustee shall be required to give any bond or other security for the faithful performance of their duties

*DAA*

in any jurisdiction whatsoever, or if any such bond shall be required, no surety shall be required.

**_SIXTH:_**    All estate, inheritance, legacy, succession, and transfer taxes, if any, including any interest or penalties thereon, imposed by the laws of the United States or of any state or territory or by any foreign government with respect to the property passing under this Will and assessed as a result of my death shall be paid by my Executor out of the general assets of my Estate as an expense of administration. My Executor has full power and authority to pay, compromise, or settle any such taxes at any time, whether on present or future interests. If for the purpose of computing any such tax, any property passing hereunder, my Executor shall pay as aforesaid the portion of such tax apportioned to the property passing under this Will in accordance with applicable laws, and in addition, my Executor in his discretion may pay as aforesaid all or any part of the remainder of such tax. Nothing herein contained, however, shall be construed to limit the authority of my Executor or against my estate, or for which said executor is liable by law, or which may constitute a lien against my estate.

**_SEVENTH_**:  No portion of any income or principal given or payable to any beneficiary under this Will shall be subject to alienation by the beneficiary in advance of their receipt thereof, by assignment, pledge, sale, transfer, or otherwise, nor shall such income or principal or any part thereof be subject to the interference or control of any creditors, or liable for, or subject to the debts, contracts, liabilities, torts, or other obligations or any beneficiary, or subject to attachment or bankruptcy proceedings or any other legal process whatsoever.

**_EIGHTH:_**    To my son, Douglas A. Abdelnour, Jr. I bequeath the sum of $5,000.00.

**_NINTH_**: The Executor shall have full power and authority to sell, either at public or private sale including the power to sell for purposes of any distribution hereunder, or to exchange, lease for any term (even though such term may extend beyond the duration of any trust hereunder), pledge, or mortgage, in such manner, to such without obtaining the approval or license of any Court, any property, real or personal, belonging to my estate; to borrow money and to pledge securities or other property to secure any loan; and to execute all deeds, assignments, leases, mortgages, or other instruments necessary or

*DAA*

2

proper for these purposes; and no purchaser or lender of money shall be required to see to the application of the purchase money or the money loaned.

The Executor shall have full power and authority to adjust, compromise, or otherwise settle claims in favor of or against my estate on such terms as he deems advisable.

*TENTH*:    Any and all decisions, determinations, or actions made or taken by the Executor pursuant to any of the powers or discretion's given in this Will, if made or taken in good faith, shall be final and conclusive on all persons who are or may become interested in my estate under this Will, whether such decisions, determinations, or actions be made or taken expressly or be implied in their act, accounts, or other proceedings.

No Executor, Succeeding Executor, Administrator or Trustee shall be liable for any error in judgment or for any fact or default of any co-fiduciary or of any prior fiduciary hereunder; but each such fiduciary shall be liable only for his or her own willful default. Any Succeeding Executor or Administrator and any Succeeding Trustee shall respectively have all the powers, immunities, and discretion's conferred herein upon the original Executor and original Trustee herein named.

*ELEVENTH*:  The Executor, in addition to and not in limitation of all other powers conferred by this Will or by law shall have the following powers which may be exercised by him without leave of any Court and which powers, viz:

(a)    To invest and reinvest in and retain as an investment any property, real or personal, which in the opinion of the Executor is suitable, although of a kind or in an amount which might not otherwise be regarded as a proper trust investment; and any investment made or retained by the Executor in good faith shall be deemed proper;

(b)    To determine how receipts from whatever source and disbursements for whatever purpose shall be credited, charged, or apportioned between principal and income, and to determine whether or not any amortization shall be made for bonds or other securities bought at a premium or for what are ordinarily considered as wasting investments, and to determine the method and amount of amortization in all cases where the Executor decides to amortize, all without regard to the general rule of law on the subject;

*PAB*

3

(c)    To cause any securities belonging to my estate to be carried in bearer form, in the name of a nominee, or in the name of any Trustee without disclosing the existence of any Trust;

(d)    To vote in person, by proxy (with or without power of subordination) or to refrain from voting any corporate stock or other securities held as a part of my estate;

(e)    To take such action as he may deem expedient in connection with or pursuant to any plan for the reorganization, consolidation, merger, liquidation, readjustment of the financial structure, or sale of the assets of any corporation or organization, any securities of which are held by the Executor, including, but without limiting the generality of the foregoing, the power to assent to and become a party to any such plan and to invest additional money or exchange securities for other securities, and to pay the Executor proportionate share of the expenses and compensation of such committee; to exercise conversation and subscription rights; to hold any property received pursuant to any such plan, deposit or subscription;

(f)    To pay, compromise on such terms as the Executor deems advisable, or to contest any claim directly or indirectly affecting my estate;

(g)    To make any distribution hereunder in cash or in kind or partly in each, and to that end to allocate at such valuations as they may deem reasonable specific securities or other property, real or personal (including without limitation undivided interests in property), to any share or beneficiary even if as a result thereof the shares or distributions are not uniformly composed.

**TWELFTH**: References in this Will to *"Executor"* mean my Executor or Executrix, the one or more Executors or Administrators for the time being in office.

Except where in context otherwise requires, wherever in this Will words are used in one gender, they shall be treated construed to include other genders.

For all purposes of this Will any adopted child, legally adopted in any jurisdiction whatsoever, shall be treated as a child of the blood of the adopting parent.

*IN WITNESS WHEREOF*, I the undersigned, DOUGLAS A. ABDELNOUR, do hereby declare that I sign and execute this instrument, type written on 6 pages including the attestation clause, signatures of witnesses, and self proving affidavit, as my Last Will,

4

that I sign it willingly in the presence of each of the undersigned witnesses, and that I execute it as my free and voluntary act for the purposes herein expressed, this _19_ day of August, 2004.

DOUGLAS A. ABDELNOUR

    We, the undersigned witnesses, each do hereby declare in the presence of the aforesaid Testator that on this _19_ day of August, 2004 the said Testator, DOUGLAS A. ABDELNOUR signed and executed the foregoing instrument in our presence and declared it to be his Last Will and Testament and that he willingly signed the same, that he executed it as his free and voluntary act for the purposes therein expressed, that each of us hereby signs this Will, at his request and in his presence and in the presence of each other and that to the best of our knowledge the Testator is 18 years of age or over, of sound mind and under no constraint or undue influence.

Testator

*WITNESSES:*

Witness

Name
Maria L. Plese

Privacy Act
Address
Tisbury, MA 02568

Witness

Name
NANcy G. Ross

Privacy Act
Address
Oak Bluffs, MA 02557

5

COMMONWEALTH OF MASSACHUSETTS

County of Dukes, ss.                                    _____8/19_____, 2004

      Subscribed, sworn to and acknowledged before me by the said Testator,
DOUGLAS A. ABDELNOUR and _MARIA L. PLESE_ and
_NANCY C. LAU_ witnesses this _19th_ day of _August_, 2004.

_____
Sean E. Murphy
Notary Public

My Commission Expires:  11-25-05

6

**DEPO-Joseph G. Moujabber, 4/10/2007**

**APEX Reporting**

**Page 1 to Page 91**

CONDENSED TRANSCRIPT AND CONCORDANCE

*APEX REPORTING*
*327 Summer Street*
*First Floor, Rear*
*Boston, MA     02210*
*Phone:     617-426-3077*
*FAX:     617-426-6844*

DEPO-Joseph G. Moujabber, 4/10/2007

---

### Page 1

(1) - 91
(2)
(3)
(4)    IN THE UNITED STATES DISTRICT COURT
        FOR THE
(5)    DISTRICT OF MASSACHUSETTS
(6)
(7)
(8)  UNITED STATES OF AMERICA,        )
                                      )
(9)              Plaintiff,           )
                                      )
(10) vs.                             )    CIVIL ACTION NO.
                                      )    05-CV-11421-RCL
(11) JOSEPH G. MOUJABBER, Executor of )
     the Estate of Douglas Abdelnour, )
(12)                                  )
                 Defendant.           )
(13)
(14)
(15)      THE ORAL DEPOSITION OF JOSEPH G. MOUJABBER, held
(16) pursuant to Notice, and the applicable provisions of the
(17) Federal Rules of Civil Procedure, before Rosemary Gormley, a
(18) Court Reporter and Notary Public in and for the Commonwealth
(19) of Massachusetts, at the law offices of Mickelson Barnet,
(20) PC, 30 Cornell Street, New Bedford, Massachusetts, on
(21) Tuesday, April 10, 2007, commencing at 10:30 a.m.
(22)
(23)
(24)
(25)

---

### Page 2

(1)  APPEARANCES:
(2)      On behalf of the Plaintiff:
(3)      ROBERT J. KOVACEV, ESQ.
(4)      Trial Attorney
(5)      United States Department of Justice
(6)      Tax Division
(7)      Ben Franklin Station
(8)      P.O. Box 55
(9)      Washington, DC  20044
(10)     (202) 307-6541
(11)
(12)     On behalf of the Defendant:
(13)     JOHN F. WHITESIDE, JR., ESQ.
(14)     GREGORY J. KOLDYS, ESQ.
(15)     Mickelson Barnet, PC
(16)     30 Cornell Street
(17)     New Bedford, MA  02740-1709
(18)     (508) 993-8800
(19)
(20)
(21)
(22)
(23)
(24)
(25)

---

### Page 3

(1)                    I N D E X
(2)  WITNESS                                    PAGE
(3)  Joseph George Moujabber
(4)    (by Mr.Kovacev)                            5
(5)
(6)  EXHIBIT    DESCRIPTIO                       PAGE
(7)  No. 1      Group of document                 56
(8)  No. 2      Multipage document, mortgage      63
(9)  No. 3      Two-page document, Mortgage of real estate
(10)            to the H&B Family Realty Trus     65
(11) No. 4      Multipage document, will of Mr.Abdelnou 66
(12) No. 5      Collection of document            72
(13) No. 6      Schedule of beneficiaries.
(14)            H&B Family Realty Trus            77
(15) No. 7      Abdelnour Realty Trus             78
(16) No. 8      Harry L. Realty Trus              78
(17) No. 9      Document from District Director, Internal
(18)            Revenue Servic                    81
(19)
(20)
(21)
(22)
(23)
(24)
(25)

---

### Page 4

(1)                S T I P U L A T I O N S
(2)  IT IS HEREBY STIPULATED AND AGREED TO
(3)  by and between the parties and their
(4)  respective attorneys, that all
(5)  objections, except as to the form of the
(6)  questions, shall be reserved until the
(7)  time of trial; that the filing of the
(8)  deposition be waived; and, that the
(9)  witness may read and sign the deposition
(10) without any Notary Public being present.
(11)
(12)
(13)
(14)
(15)
(16)
(17)
(18)
(19)
(20)
(21)
(22)
(23)
(24)
(25)

---

## Page 17

(1)    A    He gave the – did them right there, they were
(2)  doing them. And he got somebody with him that – I think a
(3)  trust, you know, Joe, a line of trust and make a new trust.
(4)    Q    Okay. Was it just one trust or many trusts at
(5)  that point?
(6)    A    I think only two trusts.
(7)    Q    Do you remember what they were?
(8)    A    Used to be H&B Realty Trust andAbdelnour Realty
(9)  Trust.
(10)   Q    What was your understanding of what – in this
(11)  transaction that we're talking about, with the meeting with
(12)  the attorney about the trusts, what was your understanding
(13)  that – well, let me ask it this way: Did you have an
(14)  understanding of whether you would be taking over as a
(15)  trustee or a beneficiary or in some other role with those
(16)  trusts?
(17)   A    No, I didn't.
(18)   Q    Okay. Are you now a trustee of the H&B Realty
(19)  Trust?
(20)   A    Yeah.
(21)   Q    How about the Abdelnour Realty Trust, are you now
(22)  a trustee of that?
(23)   A    Both of them, yeah.
(24)   Q    Okay. Those are both the trusts that on the day
(25)  with the transaction that we just discussed?

## Page 18

(1)    A    Yeah.
(2)    Q    On that day you became trustee; is that correct?
(3)    A    No.
(4)    Q    No? Okay.
(5)    A    I don't know, maybe a week later, some other time
(6)  they come back, was they have paper ready and sign here,
(7)  sign here, he sign, Doug, Sr., sign paper and I sign some
(8)  paper, with the present people, guys from the bank, from
(9)  Plymouth Savings Bank, they were all there. Eddie Sylvia,
(10)  the bank, and a lawyer of the bank, and Doug Abdelnour and
(11)  I.
(12)   Q    Okay. So just to make sure I understand what
(13)  happened, there was a meeting with I guess Attorney Sylvia
(14)  and maybe one other person?
(15)   A    Yeah.
(16)   Q    At that first one?
(17)   A    Eddie Sylvia, yeah.
(18)   Q    And was Mr.Abdelnour there?
(19)   A    Yeah.
(20)   Q    And they told you that – they asked you if you
(21)  were ready to take responsibility for the entire business?
(22)   A    Yeah.
(23)   Q    Correct?
(24)   A    Yeah.
(25)   Q    And then they asked you to take some role with the

## Page 19

(1)  H&BRealty Trust and the Abdelnour Realty Trust at that
(2)  meeting?
(3)    A    You're not talking when I did the lease, it's the
(4)  second time.
(5)    Q    This is the second time. That's right.
(6)    A    Yeah.
(7)    Q    Okay. And I take it you accepted?
(8)    A    Yeah.
(9)    Q    Okay. Did you have to pay anything?
(10)   A    Well, the mortgage was 772,000 or 73,000 dollar.
(11)  This is when I signed the paper to the bank. This is the
(12)  amount that I owe now to Plymouth Savings Bank.
(13)   Q    Okay. So you took over the mortgage for which
(14)  property?
(15)   A    Nancy's property, Abdelnour Realty Trust property
(16)  and the boat.
(17)   Q    And the boat?
(18)   A    And the boat.
(19)   Q    Where's the boat now?
(20)   A    I sold – letting the bank sold it.
(21)   Q    Okay. Was it – did the bank foreclose on the
(22)  boat?
(23)   A    They fore – I think they sold it and wasn't
(24)  enough money, so I had to pay the rest of the money. I'm
(25)  still paying it.

## Page 20

(1)    Q    Okay. So what was the property that was under the
(2)  Abdelnour Realty Trust?
(3)    A    It's a garage with an apartment. That garage all
(4)  for supply for Nancy, equipment, grill, things that Nancy
(5)  use, and upstairs an apartment where the employees live.
(6)    Q    Okay. Is that on 29 Upper Douglas Lane?
(7)    A    This is 10.
(8)    Q    10 Upper Douglas Lane. Okay.
(9)    And what was the property in the H&BRealty Trust?
(10)   A    Nancy's. 29 Lake Avenue.
(11)   Q    29 Lake Avenue?
(12)   A    Yeah.
(13)   Q    Okay. Are you a trustee of any other trusts at
(14)  this point?
(15)   A    No.
(16)   Q    Have you ever been a trustee of any other trusts?
(17)   A    No. I don't know what a trust till now is it.
(18)  (Laughter.)
(19)   Q    So you didn't realize that there was a trust until
(20)  just recently?
(21)   A    No.
(22)   Q    Oh, okay. Okay, so you've known since the
(23)  beginning that you were taking over as the trustee of the
(24)  H&B and the Abdelnour Realty Trusts?
(25)   A    Yes.

Page 21

(1)  Q   Okay. Is there an H&B Family Realty Trust?
(2)  A   Not to me. I don't know.
(3)  Q   Okay. How about a Douglas Realty Trust?
(4)  A   Nothing, nothing to do with me.
(5)  Q   Okay. Are you aware that it exists?
(6)  A   I heard of it, but I don't know nothing about it.
(7)  Q   Where did you hear of it?
(8)  A   Through these lawyers here.
(9)  Q   Okay. Other than communications from counsel,
(10) have you ever heard of the Douglas Realty Trust?
(11) A   No.
(12) Q   Okay. Have you ever heard of the DA Junior Realty
(13) Trust?
(14) A   No.
(15) Q   The Harry L Realty Trust?
(16) A   No.
(17) Q   The Bonnie B Realty Trust?
(18) A   No.
(19) Q   The REM Realty Trust?
(20) A   No.
(21) Q   The D/A Realty Trust or DA Realty Trust?
(22) A   No.
(23) Q   Bertha B Realty Trust?
(24) A   No.
(25) Q   Baron H. Realty Trust?

Page 22

(1)  A   No.
(2)  Q   MVMI Realty Trust? Do the initials MVMI mean
(3)  anything to you?
(4)  A   No.
(5)  Q   Was there at one time a business that
(6)  Mr.Abdelnour ran that had the MVMI as its initials?
(7)  A   I don't know.
(8)  Q   So just to be clear, all those, the trusts that I
(9)  just listed for you, you said that you have no knowledge of
(10) them?
(11) A   No.
(12) Q   Okay. Before just recently, maybe in conversation
(13) with counsel, but other than that, you had no knowledge of
(14) them?
(15) A   Nothing to do with them.
(16) Q   You have nothing to do with them, any of them?
(17) A   Any of them. No.
(18) Q   I will say since. So the only trusts that you had anything to
(19) do with were the H&BRealty Trust?
(20) A   Yeah.
(21) Q   Correct? And the Abdelnour Realty Trust?
(22) A   Yeah. Yes, sir.
(23) Q   And that's it?
(24) A   That's it.
(25) Q   Okay. What is Douglas Island Development

Page 23

(1)  Corporation?
(2)  A   That's d/b/a Nancy.
(3)  Q   Okay. Do Douglas Island is the corp, the actual
(4)  corporation?
(5)  A   Is for Nancy.
(6)  Q   Okay. And that's Nancy?
(7)  A   Yes.
(8)  Q   So you're talking about Nancy's and ---
(9)  A   Douglas Island.
(10) Q   So when you say you're 100-percent owner of
(11) Nancy's, you mean you're 100-percent owner of ---
(12) A   Douglas Island.
(13) Q   --- Douglas Island Development Corp?
(14) A   Yeah.
(15) Q   Okay. How long have you been 100-percent owner of
(16) Douglas Island Development Corp.?
(17) A   Since the day – actually, the lease, when I think
(18) I signed that lease, the corporation. It's when I did the
(19) lease.
(20) Q   Okay.
(21) A   100 percent.
(22) Q   Okay. Just to be clear, you became 100-percent
(23) ownerof Douglas Island Development Corporation at the time
(24) in the early Nineties when you first signed a lease ---
(25) A   Yeah.

Page 24

(1)  Q   --- to operate Nancy's? Okay.
(2)  A   I think so. Yeah.
(3)  Q   Okay. How did that come about? Why did that
(4)  happen? I mean ---
(5)  A   What do you mean?
(6)  Q   Like who told – well, let me ask it this way.
(7)  When did you first find out that you were going to become an
(8)  owner of Douglas Island Development Corporation?
(9)  A   When I leased Nancy, they told me, this is
(10) corporation and they start telling me this is d/b/a Nancy to
(11) protect you.
(12) Q   Okay. At that time did they tell you that you
(13) would become 100-percent owner of that corporation?
(14) A   I don't remember that, but what I know now, I know
(15) I was the owner.
(16) Q   Okay. So how long have you been 100-percent owner
(17) of Douglas Island Development Corporation?
(18) A   I will say since – actually, I couldn't say if I
(19) don't know about it.
(20) Q   Okay. Before you were the 100-percent owner of
(21) Douglas Island Development Corporation, who was the owner
(22) of that corporation?
(23) A   Doug.
(24) Q   Okay. Do you know what percent ownership he had?
(25) A   I think he had everything.

## Page 33

(1)   A   No. Through friends.

(2)   Q   Through friends. Do you remember which friends?

(3)   A   I know one guy is named Gino Kurtney (phonetic).

(4)   Q   Okay. Could you spell that?

(5)   A   It's hard for me to spell it.

(6)   Q   Okay. Kurtney?

(7)   A   Yeah.

(8)   Q   And Mr.Kurtney, does he live in Oak Bluffs?

(9)   A   No. Edgartown.

(10)  Q   Edgartown, okay.

(11)  And Mr.Abdelnour stayed with Mr.Kurtney for a

(12)  period of time?

(13)  A   Like every winter, almost.

(14)  Q   Every winter?

(15)  A   Yeah. I mean, wintertimes is when he lived there,

(16)  yeah.

(17)  Q   Where did Mr.Abdelnour stay in the summer?

(18)  A   Was an apartment in Nancy.

(19)  Q   Was that the apartment on Upper Douglas Lane?

(20)  A   Yeah.

(21)  Q   Okay. When Mr.Abdelnour stayed at Upper Douglas

(22)  Lane, did he pay rent?

(23)  A   No.

(24)  Q   Did he pay any utilities, other expenses?

(25)  A   No.

## Page 34

(1)   Q   Okay. Who did?

(2)   A   I did.

(3)   Q   Okay. You personally or Douglas Island

(4)   Development Corporation?

(5)   A   That, I don't know.

(6)   Q   Okay. I'm assuming that Douglas Island

(7)   Development Corporation has a bank account, correct?

(8)   A   Yeah.

(9)   Q   Okay. And the mortgages to the Plymouth, does

(10)  Douglas – on the Lake Avenue and the Upper Douglas

(11)  properties, does Douglas Island Development Corp. pay that

(12)  or do you pay that personally?

(13)  A   I think I pay it personally.

(14)  Q   You pay it personally?

(15)  A   Yeah.

(16)  Q   When you became the 100-percent owner of Douglas

(17)  Island Development Corporation, did you pay any money for

(18)  the stock of that corporation?

(19)  A   No. Was nothing there.

(20)  Q   Okay. Have you ever paid any money to anyone for

(21)  the stock of Douglas Island Development Corporation?

(22)  A   No. No.

(23)  Q   Okay. After you became the owner of Douglas

(24)  Island Development Corporation, did Mr.Abdelnour continue

(25)  to have a role in what the corporation was doing?

## Page 35

(1)   A   No.

(2)   Q   Okay. Did he have a role in Nancy's?

(3)   A   Yes.

(4)   Q   What was that role?

(5)   A   He was the manager of liquor license because I

(6)   wasn't citizen at that time, so he stay because the liquor

(7)   license is in his name – I mean, the business, well, he's

(8)   the manager.

(9)   Q   Okay. How long was he the manager of Nancy's?

(10)  A   After I become citizen, maybe a year later or

(11)  after I got, switch it to my name.

(12)  Q   Okay. When was that?

(13)  A   I think late Nineties.

(14)  Q   Can you be a little more specific than that?

(15)  A   Late Nineties I know.

(16)  Q   Okay. After – so at some point Mr.Abdelnour

(17)  ceased being the manager of Nancy's?

(18)  A   Yeah.

(19)  Q   Okay. And that was in the late Nineties after you

(20)  became a United States citizen and ---

(21)  A   Yeah.

(22)  Q   Okay. And could get a liquor license on your own?

(23)  A   Yes.

(24)  Q   Okay. After that, what was his role?

(25)  A   Nothing. Just nothing.

## Page 36

(1)   Q   So Mr.Abdelnour didn't have any participation in

(2)   managing Nancy's?

(3)   A   No.

(4)   Q   Or working at Nancy's?

(5)   A   No.

(6)   Q   Did he receive any salary or dividends or any

(7)   other, you know ---

(8)   A   No.

(9)   Q   --- money from Nancy's or from Douglas Island

(10)  Development Corporation ---

(11)  A   No.

(12)  Q   --- at that time?

(13)  A   No.

(14)  Q   How about when he was a manager, did he receive a

(15)  salary?

(16)  A   Yeah.

(17)  Q   Okay. How much was it?

(18)  A   I don't know, 500 or 600 dollars a week.

(19)  Q   A week? Was that just for the summer or

(20)  throughout the year?

(21)  A   Just for the summer.

(22)  Q   Okay. Did he receive anything the rest of the

(23)  year?

(24)  A   No.

(25)  Q   Okay. And did he receive that salary throughout

## Page 45

(1) Q. Okay. I think you testified earlier that when
(2) Mr. Abdelnour lived in the 10 Upper Douglas Lane, in the
(3) apartment ---
(4) A. Yeah.
(5) Q. --- he did not pay rent or utilities or anything?
(6) A. No.
(7) Q. Okay. Before he lived there, where did he live?
(8) A. He used to live in Barnes Road and he own a house
(9) on Barnes Road.
(10) Q. Is that different from the 35 Barnes Road?
(11) A. Yeah.
(12) Q. Okay. What was the house that he owned?
(13) A. I don't know the address.
(14) Q. Okay. Could have been 345 Barnes Road?
(15) A. Could be. I don't know.
(16) Q. Okay. What happened to that property?
(17) A. The bank took it.
(18) Q. Okay. Plymouth, again?
(19) A. No. That's I think Compass Bank.
(20) Q. Okay. Do you know when that happened?
(21) A. No.
(22) Q. Now as the executor of Mr. Abdelnour's estate, I
(23) take it you're charged with an accounting of his estate,
(24) correct?
(25) A. Yeah. Yeah.

## Page 46

(1) Q. Okay. And there's going to be a hearing coming up
(2) in probate court about that right? Okay.
(3) A. Mm-hm.
(4) Q. What have you done to ascertain the assets that
(5) Mr. Abdelnour had at the time of his death?
(6) A. I hire the counsel here to see what he got.
(7) Q. Okay. So any information that you have about his
(8) assets at the time of his death is information you got from
(9) your lawyers?
(10) A. Say it again.
(11) Q. I'm trying to find out, how did you go about
(12) finding out what Mr. Abdelnour had?
(13) A. Through the lawyers.
(14) Q. And that's all?
(15) A. That's all.
(16) Q. Okay. Do you have an understanding of what he had
(17) at the time of his death?
(18) A. I know he had nothing, my understanding.
(19) Q. Okay. Did Mr. Abdelnour have nothing just at
(20) death or for a while before that?
(21) A. A while.
(22) Q. Like how long?
(23) A. Good while, because he was living on fixed income
(24) or whatever you call it. He lived – what do you call it?
(25) Welfare?

## Page 47

(1) Q. No. Social security, maybe?
(2) A. Disability.
(3) Q. Oh.
(4) A. Disability checks. Yeah.
(5) Q. Do you know how long he was living just on his
(6) disability checks?
(7) A. No idea.
(8) Q. Okay. Was Mr. Abdelnour from Lebanon originally?
(9) A. His parents.
(10) Q. His parents?
(11) A. He's not from Lebanon.
(12) Q. Okay. Did he ever travel?
(13) A. I don't think so, no.
(14) Q. Okay. In the early Nineties, where did
(15) Mr. Abdelnour live?
(16) A. I think in Barnes Road.
(17) Q. In Barnes Road, not 35, but a different ---
(18) A. Yeah. Yeah.
(19) Q. --- property on Barnes Road?
(20) A. Yeah.
(21) Q. And do you know whether he owned that personally
(22) or through a trust?
(23) A. That, I don't know.
(24) Q. Okay. And that's a property that you testified
(25) was foreclosed upon at some point?

## Page 48

(1) A. To my knowledge, that the bank took it.
(2) Q. Okay. And then when that happened, where did he
(3) go?
(4) A. He lived on – I think, I'm not sure, if he went
(5) to that warehouse.
(6) Q. 10 Upper Douglas Lane?
(7) A. Yeah.
(8) Q. At that point?
(9) A. Yeah.
(10) Q. Whenever that was?
(11) A. Yeah.
(12) Q. Okay. When you became the owner of Douglas Island
(13) Development Corporation/Nancy's, was it making money at that
(14) time?
(15) A. Only summertime.
(16) Q. But was it profitable?
(17) A. It was paying the mortgage.
(18) Q. So I take it that's a, yes, it was profitable?
(19) A. Yes. Yes.
(20) Q. Okay. I take it there have been some changes to
(21) Nancy's since the early Nineties when you took it over?
(22) A. Mm-hm.
(23) Q. Right. What were those changes?
(24) A. I knock the apartment out and I put a second floor
(25) as came out. I have sit-down restaurant now and take-out.

Page 49

(1) Q Okay. I'm going to take it as the building has
(2) grown, the business has grown, too, right?
(3) A Yeah.
(4) Q Okay. And the profits have grown, as well, I
(5) assume?
(6) A Yeah.
(7) Q Okay. If you know, how much in revenues Nancy's
(8) made I guess 2006?
(9) A I didn't finish yet. I'm getting my paper ready
(10) for the accounting this week.
(11) Q Okay. How about 2005?
(12) A Oh, about – we gross about million-seven, maybe,
(13) million-six, million-seven.
(14) Q Okay. Is that gross or net?
(15) A Gross.
(16) Q Okay. Do you have a sense of what the net is?
(17) A Oh, maybe 10 grand or 11 grand.
(18) Q Okay. That's after like your compensation and –
(19) A Yeah.
(20) Q --- all the other things, right?
(21) A Yeah.
(22) Q Okay. I take it you take a salary from that?
(23) A Yeah.
(24) Q Have you always taken a salary from Nancy's or
(25) Douglas Island Development Corporation since you became an

Page 50

(1) owner?
(2) A Yeah.
(3) Q Okay. Have you ever had the property at 29Lake
(4) Avenue appraised?
(5) A Not lately.
(6) Q Have you ever?
(7) A Yes.
(8) Q When? When's the last time?
(9) A Maybe 2000, maybe. At that time I was doing, you
(10) know, around 2000, maybe.
(11) Q Okay. Do you remember what the appraised value of
(12) the property was?
(13) A About two and a half million, maybe.
(14) Q If you have a sense of it, and I know you're not a
(15) real estate appraiser, has the value increased or decreased
(16) since then?
(17) A The way it is now, I think increased.
(18) Q Okay. By about how much, if you could estimate?
(19) A Well, the property went up, you know, so
(20) everything has gone up.
(21) Q Right. Is it fair to say property values have
(22) increased substantially ---
(23) A Yes.
(24) Q --- in Martha's Vineyard since 2000, 2001?
(25) A Yeah, it went up and went down, back. It's flat

Page 51

(1) now. So went up, maybe is worth now maybe three to three
(2) and a half, maybe.
(3) Q Okay. That's the 29Lake Avenue property?
(4) A Yeah. Yeah.
(5) Q Okay. Has 10Upper Douglas Lane ever been
(6) appraised?
(7) A I think that is combined, because they're all on
(8) one. I just want the appraisal that.
(9) Q Okay. So this mortgage – this appraisal was done
(10) in connection with a mortgage you were trying to get?
(11) A Yeah.
(12) Q Okay. Who was that mortgage from or was?
(13) A Still, now Eastern Bank and no more Plymouth
(14) Savings Bank, I think. I'm not sure, is Plymouth Bank or
(15) Eastern Bank, I'm not sure. Plymouth Savings Bank could be
(16) in the 2000, because Eastern Bank maybe a couple of years
(17) now.
(18) Q Okay. Did you get the mortgage?
(19) A No.
(20) Q Why not?
(21) A I couldn't do it. I got mortgage for my house, to
(22) when I did Nancy.
(23) Q Okay. So this was after the mortgage that you
(24) testified earlier ---
(25) A Yeah.

Page 52

(1) Q --- where you had to pledge your house ---
(2) A Yeah.
(3) Q --- and so forth?
(4) A Yeah. This is when I got the appraisal.
(5) Q Okay. When you became – took over and became
(6) 100-percent owner of Douglas Island Development Corporation,
(7) did you have a sense of what Mr.Abdelnour's financial
(8) condition was at that time?
(9) A Not really.
(10) Q Okay. Did you know whether he was doing well or
(11) was doing poorly financially?
(12) A When I took it over, then I know he is doing
(13) poorly.
(14) Q Okay. How did you know that?
(15) A Because he told me, don't buy any stuff. So I
(16) know.
(17) Q Okay. When you became the trustee of the
(18) Abdelnour Realty Trust and the H&BRealty Trust, did you
(19) know at the time that there were liens or mortgages or some
(20) encumbrance from the IRS on those properties?
(21) A Not at that time.
(22) Q Okay. Did Mr.Abdelnour have a bank account
(23) before he passed away?
(24) A Yes.
(25) Q Do you know where that was?

Page 53

(1)   A   Edgartown National Bank.
(2)   Q   Okay. Was it a checking account, savings account,
(3)   both?
(4)   A   I think both.
(5)   Q   Okay. Did he have any other accounts?
(6)   A   Not to my knowledge.
(7)   Q   How about brokerage accounts?
(8)   A   Nothing. No. Not to my knowledge.
(9)   Q   Okay. Well, I take it, since you're the executor
(10)  you've taken steps to ascertain what his assets were at the
(11)  time of his death?
(12)  A   The only steps I got is hire the attorneys. To my
(13)  knowledge, I know what he got, what he got there, I found in
(14)  his room, but nothing else.
(15)  Q   Okay. So you went into his room after he passed
(16)  away?
(17)  A   Yeah.
(18)  Q   And what, you found bank statements from that
(19)  bank?
(20)  A   Yeah.
(21)  Q   Are you aware of any real estate that
(22)  Mr.Abdelnour owned at the time of his death?
(23)  A   No.
(24)  Q   Okay. Any stocks in any corporations?
(25)  A   No.

Page 54

(1)   Q   Do you know whether he was a trustee or
(2)   beneficiary of any trusts?
(3)   A   Not to my knowledge.
(4)   Q   Okay. When you took over Douglas Island
(5)   Development Corporation, when you became the 100-percent
(6)   owner of that corporation, I assume it had a bank account at
(7)   that point, right?
(8)   A   Yeah.
(9)   Q   Where was that? What bank?
(10)  A   Edgartown National Bank.
(11)  Q   Okay. Has Douglas Island Development Corp. had an
(12)  account at Edgartown all the way through?
(13)  A   Yeah.
(14)  Q   Since that time to today?
(15)  A   Yeah.
(16)  Q   Any other accounts at any other institutions for
(17)  Douglas Island Development Corp.?
(18)  A   Not to my knowledge.
(19)  Q   Okay. Do you know — well, let me ask it this
(20)  way: Mr.Abdelnour, in the time between when you took over
(21)  as 100-percent owner of Douglas Island Development
(22)  Corporation until the time of his death, did he — at any
(23)  point in that time, are you aware of any investments that he
(24)  made?
(25)  A   No.

Page 55

(1)   Q   Okay. Any property that he purchased?
(2)   A   No.
(3)   Q   Okay. Any gifts that he gave to anybody?
(4)   A   No.
(5)   Q   Okay. Other than nominal, you know, gifts?
(6)   A   Say again.
(7)   Q   Other than just like a birthday card or something
(8)   like that?
(9)   A   No. He came and live in my house the last three
(10)  years or four years because he came out sick.
(11)  He was there bellyache and he need somebody to
(12)  take him to a doctor. This is how I came out more familiar
(13)  with his stuff. Before that, I am not much know about him.
(14)  Q   Okay. I take it, when he lived at County Road, he
(15)  didn't pay you rent?
(16)  A   No.
(17)  Q   Or any utilities or ---
(18)  A   No.
(19)  Q   --- or anything like that? Okay.
(20)  At the point before you became 100-percent owner
(21)  of Douglas Island Development Corp., did you own any part of
(22)  it or was that 100-percent owned by Mr.Abdelnour?
(23)  A   I think 100-percent owned by Abdelnour
(24)  MR. KOVACEV:    Let's take a five-minute break.
(25)  (Whereupon, a recess was taken at 11:45 a.m to

Page 56

(1)   11:50 a.m.)
(2)   MR. KOVACEV:    Let's go ahead and mark this one.
(3)   This will be Exhibit 1.
(4)   (Moujabber Deposition Exhibit 1
(5)   marked.)
(6)   MR. KOVACEV:    Just take a look at it.
(7)   BY MR. KOVACEV:
(8)   Q   Mr.Moujabber, we've taken a break, we're back on
(9)   the record. You understand you're still under oath, right?
(10)  A   Yes, sir.
(11)  Q   You've had a chance to look at what's been marked
(12)  as Exhibit 1?
(13)  A   Yes, sir.
(14)  Q   Which is a multipage document, the first page of
(15)  which is a fax cover sheet from Citizens Bank to Douglas
(16)  Island Development Corp., attention Joseph G. Moujabber,
(17)  President. Do you recognize this document?
(18)  A   Yes, sir.
(19)  Q   Okay. And I'm talking about, I guess, the first
(20)  four pages first. First of all, though, let me ask you
(21)  this: Just based on how it's put together, it seems like
(22)  there are a few different document put together into this
(23)  package. Does that — do you agree with that or do you
(24)  think these were all together in your files?
(25)  A   I don't know.

**Page 57**

(1) Q. Okay. Well, I'll start from the beginning, I'll
(2) start on the first page, Page 1 of Exhibit 1.
(3) A. Yeah.
(4) Q. The very first page, the fax cover sheet.
(5) A. Okay. Yeah.
(6) Q. Do you remember requesting an appraisal from
(7) Citizens Bank on or about April 30th, 2001?
(8) A. I wasn't asking for appraisal. The guy, he want
(9) to get the job – he want to get the loan, Nancy's loan, and
(10) he tries. Say, I'll do you appraisal. And I never
(11) recognize it. I wasn't planning to move in there, but he
(12) did that appraisal. I remember, I seen it before, but I
(13) never like I thought about it.
(14) Q. Okay. Did you attempt to get a mortgage from
(15) Citizens Bank in the 2001 time frame?
(16) A. Let me see, repeat it again. The guy's name is
(17) Larry Venezia. He used to work at the Plymouth Savings Bank
(18) and he was trying to take cash more than which he can, and
(19) he came in and he say, I can give a loan, take the mortgage
(20) over. And I never look into it, but said, yeah, yeah, yeah.
(21) Then in a way he screwed me, too. Excuse my language.
(22) Q. Well, why do you say that?
(23) A. Because he said, give me check, I won't cash it.
(24) And just give me check, I won't cash it, and I'll give you
(25) an appraisal and do all the paper. He cashed the check and

**Page 58**

(1) nothing happened, so. Excuse my language.
(2) Q. No, I might agree with you, if I were in your
(3) position.
(4) A. You know, I don't want to do it and he did it, and
(5) he's trying to get mortgage.
(6) Q. Okay. If you look on the second page.
(7) A. Yes.
(8) Q. It looks like the cover page of a report, complete
(9) appraisal report for 29 Lake Avenue. Do you see that?
(10) A. Yeah.
(11) Q. Do you remember receiving an appraisal report kind
(12) of in that format in the 2002 time frame?
(13) A. Never, I haven't. You know, I remember seeing it,
(14) I know, so I see the logo Citizens Bank, I know I have it.
(15) Q. Okay. Did you participate in getting an appraisal
(16) in that 2001, 2002 time frame, maybe walking through, taking
(17) an appraiser to walk through the property at Lake Avenue?
(18) A. Tell you the truth, I don't remember.
(19) Q. Okay. You don't remember. Okay.
(20) But if there was an appraisal, this would be in
(21) connection with getting a ---
(22) A. To move from Plymouth to him.
(23) Q. To move the account to Citizens Bank?
(24) A. Yeah.
(25) Q. I see. And that was the only reason?

**Page 59**

(1) A. Yeah.
(2) Q. Okay. If you look at what's the fourth page of
(3) the exhibit, it's like the last – it says Page 4 of 14 at
(4) the very top of the fax. It's the page before that, I
(5) think.
(6) A. Yeah.
(7) Q. Now there's – kind of halfway down the page,
(8) there's reference to what appears to be the opinion of the
(9) appraiser as to the value of the property as of
(10) January 29th, 2002. Okay. And the first number is a market
(11) value of the real estate given at 528,000, right? You see
(12) that?
(13) A. Yeah.
(14) Q. Okay. And then the second value says that the
(15) completed value, with the addition of the second-floor
(16) restaurant, and it has a higher number, 929,000. Okay?
(17) A. Yeah.
(18) A. Are you with me? I just want to ---
(19) A. Yeah.
(20) Q. So do you remember – do you have a sense of –
(21) and let me ask it this way: Do you remember seeing the
(22) appraisal, the appraisal, like the amounts of the appraisal
(23) of the real estate at that time, that 2002 time frame?
(24) A. You know, to me wasn't interested what the guy is
(25) doing. I never want it.

**Page 60**

(1) Q. Okay. Now about – was it about this time when
(2) you were about to add a second floor to Nancy's?
(3) A. This is before that, I think. This is before
(4) Nancy's – this is after, I'm sorry. This is after Nancy's
(5) done upstairs. You know, seems to be the way I see it, is
(6) after.
(7) Q. Okay. Then the next paragraph says: And
(8) alternatively the going concern value of the subject
(9) property, as defined as is, as of January 29th, 2002, is
(10) $2,500,000.
(11) Do you remember having any discussion with an
(12) appraiser in this 2002 time frame about the going concern
(13) value of the business on the property at 29 Lake Avenue of
(14) Nancy's?
(15) A. No. No.
(16) Q. Does that sound like a reasonable estimate to you
(17) of the value of the business and the property in 2002?
(18) A. I know it was updated, yeah.
(19) Q. And you think it's increased since then?
(20) A. Yes.
(21) Q. Okay. By about how much, if you had to estimate?
(22) A. About three to three and a half.
(23) Q. Three to three and a half million?
(24) A. That's everything, yeah.
(25) Q. Okay. If you'll turn to the next page?

Page 61

(1)    A    Yeah.

(2)    Q    It's entitled: Small Residential Income Property

(3)    Appraisal Report, and it appears to be 10 Upper Douglas

(4)    Lane?

(5)    A    Yeah.

(6)    Q    Do you see that?

(7)    A    Yeah.

(8)    Q    Do you remember requesting a property appraisal of

(9)    10 Upper Douglas Lane in about the 2002 time frame?

(10)   A    No.

(11)   Q    Okay. Have you ever seen such a report?

(12)   A    I say it, again, all I see that, and I put it on a

(13)   shelf and it could be it happened because, like I said, the

(14)   mortgage for Nancy and 10 Douglas Lane, they all on the same

(15)   one mortgage.

(16)   Q    Okay.

(17)   A    So what you want to do Nancy, you want to do

(18)   10 Douglas Lane.

(19)   Q    Okay. Turning to the last page of this. Looks

(20)   like a copy of a check.

(21)   A    Yeah.

(22)   Q    Is this the check that you were talking about?

(23)   A    Yeah.

(24)   Q    That's the one that they ---

(25)   A    Yeah.

Page 62

(1)    Q    That the person from Citizens Bank said he

(2)    wouldn't cash, but actually did?

(3)    A    Yeah. Say it won't cost me nothing.

(4)    Q    Now I notice that this was drawn from your

(5)    personal account at Plymouth Savings; is that correct?

(6)    A    Yeah.

(7)    Q    Okay. Does the Abdelnour Realty Trust have its

(8)    own bank account?

(9)    A    No.

(10)   Q    Or H&B Family Realty Trust?

(11)   A    No.

(12)   Q    Okay. So any mortgage payments, upkeep, utilities

(13)   payments for 10 Upper Douglas Lane, first, would be paid by

(14)   who or what?

(15)   A    All I know myself, I paid the mortgages

(16)   personally. Any expense got to do his own, please, or

(17)   expenses in Nancy, Nancy would pay.

(18)   Q    Okay. And the properties themselves, as far as

(19)   you know, are in the record title name of the trusts?

(20)   A    Trusts, yeah.

(21)   Q    Okay. Not of the corporation?

(22)   A    Yeah.

(23)   MR. KOVACEV:    Mark as No. 2, a multipage document,

(24)   the first page of which has Mortgage Of Real Estate At Book

(25)   609 through 743.

Page 63

(1)    (Moujabber Deposition Exhibit 2

(2)    marked.)

(3)    BY MR. KOVACEV:

(4)    Q    Would you just take a look at that and let me know

(5)    when you're ready.

(6)    A    What do you want to know?

(7)    Q    Okay. Well, my first question, I'll represent to

(8)    you this appears to be four, I think it's four, two, three,

(9)    four, five, five separate documents in here that are

(10)   entitled Mortgages, Mortgage Of Real Estate. Have you ever

(11)   seen any of these documents before?

(12)   A    Yeah. Lately, yeah.

(13)   Q    Okay. When did you see them last?

(14)   A    I think when we looking for stuff.

(15)   Q    Okay. Was that the first time you had ever seen

(16)   them?

(17)   A    I think so.

(18)   Q    Okay. So any information that you have about

(19)   these mortgages, which I'll represent to you are mortgages

(20)   from Mr. Abdelnour and/or Mr. and Mrs. Abdelnour to the IRS,

(21)   any information you would have would just be information you

(22)   have from counsel; is that correct?

(23)   A    I know these mortgages, nothing else. This I

(24)   thought was a lien. Then they show me that and it said it

(25)   is mortgages.

Page 64

(1)    Q    Okay. Have you ever paid anything towards a

(2)    mortgage to the IRS on any property that you received from

(3)    Mr. Abdelnour, either trust or otherwise?

(4)    A    No.

(5)    Q    Okay. Sitting here today, do you have any reason

(6)    to believe that the mortgages to the IRS are not valid?

(7)    MR. KOLDYS:    Objection.

(8)    MR. KOVACEV:    You can answer.

(9)    A    No, shouldn't be valid because talking to my

(10)   lawyers ---

(11)   MR. KOLDYS:    Objection.

(12)   BY MR. KOVACEV:

(13)   Q    Well, you can say that your lawyers tell you it's

(14)   not valid. I don't want to know specifically why. But what

(15)   is your, in your opinion, do you think they're valid or not

(16)   valid? That's a yes or no question.

(17)   A    No.

(18)   Q    Okay. And if I were to ask you why not, could you

(19)   give me any reason, other than something that contains legal

(20)   advice from your counsel?

(21)   MR. KOLDYS:    And, again, Joe, just let me indicate

(22)   to you, anything that you -- that was discussed between you

(23)   and counsel is not something that you should be talking

(24)   about. So you have -- if you have some knowledge, other

(25)   than that, then you can answer that.

Page 65

(1)  A   No. Okay. No.

(2)  BY MR. KOVACEV:

(3)  Q   So before you talked to your lawyers about it, you

(4)  had no reason to believe that there was any problem with

(5)  these mortgages, correct?

(6)  A   No.

(7)  MR. KOVACEV:   Let's mark this one, just for

(8)  completeness sake. Exhibit No. 3 is a, it's a three-page

(9)  document. I don't think the third page belongs to this

(10)  exhibit, so I'm going to take that out.

(11)  So it's a two-page document, which is a mortgage

(12)  of real estate in the H&BFamily Realty Trust.

(13)  (Moujabber Deposition Exhibit 3

(14)  marked.)

(15)  BY MR. KOVACEV:

(16)  Q   And my question to you is going to be the same

(17)  question: Had you ever seen this document before your

(18)  lawyers – or have you ever seen it before? This document,

(19)  that's marked as No. 3?

(20)  A   Yeah.

(21)  Q   Okay. Had you seen it before your lawyers showed

(22)  it to you in the past few days?

(23)  A   No.

(24)  Q   Okay. So I take it you were here yesterday to

(25)  meet with your counsel; is that correct?

Page 66

(1)  A   Yes.

(2)  Q   Okay. And I take it they showed you a number of

(3)  documents in preparation?

(4)  A   No.

(5)  Q   Did they show you any documents?

(6)  A   No.

(7)  MR. KOVACEV:   Mark as Exhibit 4, a multipage

(8)  document. The first page is a cover letter from Mary

(9)  Kelleher of Mickelson Barnet, dated April 13th, 2006.

(10)  (Moujabber Deposition Exhibit 4

(11)  marked.)

(12)  BY MR. KOVACEV:

(13)  Q   Okay, do you recognize this document?

(14)  A   Yeah.

(15)  Q   Okay. What is it?

(16)  A   From the probate lawyer, send it to me. This

(17)  first one going to Mass. Health.

(18)  Q   Now if you look at the – six pages in, the sixth

(19)  page, it says: Last Will & Testament of Douglas A.

(20)  Abdelnour. If you could look ---

(21)  A   The sixth page I should look at?

(22)  Q   Let me see. Maybe it's the fifth page.

(23)  A   This is fifth page.

(24)  Q   Okay, the next page, in. That one.

(25)  A   Yeah.

Page 67

(1)  Q   Okay. I'd like you to look at this and I think

(2)  the next six pages, that, that looks like they constitute

(3)  the last will of Mr.Abdelnour, and I'm going to ask you

(4)  whether this is, in fact, you know, the will, the will that

(5)  was offered at the time of Mr.Abdelnour's death. So I just

(6)  want you to look at it and verify that for me.

(7)  A   Yes.

(8)  Q   Okay. It is?

(9)  A   Yes.

(10)  Q   Okay. Were there any prior wills before this,

(11)  that you're aware of?

(12)  A   Not to my knowledge.

(13)  Q   Okay. If you look at the second page of the will.

(14)  A   Yeah.

(15)  Q   Under – there's a paragraph about two-thirds of

(16)  the way down that says, Eighth.

(17)  A   Yeah.

(18)  Q   To my son, Douglas A. Abdelnour, Jr. ---

(19)  A   Yeah.

(20)  Q   --- I bequeath the sum of $5,000.

(21)  A   Yeah.

(22)  Q   Okay. Did Doug, Jr., ever receive that $5,000?

(23)  A   Not from the estate, no.

(24)  Q   Okay. Did he from anywhere else?

(25)  A   No.

Page 68

(1)  Q   Okay. If you go back to the first page of the

(2)  last will and testament, the first page of the will.

(3)  A   Yeah.

(4)  Q   Yeah. There's a paragraph that says: Second.

(5)  A   Yeah.

(6)  Q   I direct my executive to collect all my interests

(7)  in real property, shares of stock in Douglas Island

(8)  Development, Inc., and Nancy's Restaurant.

(9)  A   Yeah.

(10)  Q   And so forth?

(11)  A   Yeah.

(12)  Q   Okay. At the time of his death, did Mr.Abdelnour

(13)  have any interest in property?

(14)  A   No.

(15)  Q   Did he have any shares of stock in Douglas Island

(16)  Development?

(17)  A   No.

(18)  Q   Or Nancy's Restaurant?

(19)  A   No.

(20)  Q   Okay. It appears that this will was signed in

(21)  2000 – on August 19th, 2004?

(22)  A   Yeah.

(23)  Q   Okay. In 2004, in August 2004, id Mr.Abdelnour

(24)  have any interest in real property that you know of?

(25)  A   No.

Page 69

(1)   Q.   Okay. Or shares of stock in Douglas Island

(2)   Development?

(3)   A.   No.

(4)   Q.   Or in something in Nancy's Restaurant?

(5)   A.   No.

(6)   Q.   Why did – if you know, why did he include that

(7)   clause that's marked Second in the last will and testament?

(8)   A.   Because he was embarrassed to say he has nothing.

(9)   He went to that lawyer, I guess, and say, you know, whatever

(10)  I got, you know, everybody knows each other on the Island,

(11)  so he was embarrassed he have nothing, you know. But that's

(12)  my interpretation.

(13)  Q.   Okay. Did you have any conversations with

(14)  Mr.Abdelnour about his will?

(15)  A.   No.

(16)  Q.   Okay. Or about who would receive any bequests

(17)  or ---

(18)  A.   No.

(19)  Q.   --- inheritances after his death?

(20)  A.   No.

(21)  Q.   Did you know that you were a beneficiary under his

(22)  will?

(23)  A.   He told me, his will, if something happen to me,

(24)  in my desk.

(25)  Q.   When did he tell you that?

Page 70

(1)   A.   You know, two or three years before his death.

(2)   Q.   Okay. Before his death, did – let me ask it this

(3)   way: Is it fair to say that people knew that Mr.Abdelnour

(4)   was the person that started Nancy's Restaurant or his family

(5)   was?

(6)   A.   Everybody knows that.

(7)   Q.   Everyone? Was that still true even after you

(8)   actually had control of the corporation?

(9)   A.   Yeah.

(10)  Q.   Okay. Even at the time of his death, did people

(11)  still associate Mr.Abdelnour with ---

(12)  A.   Yeah.

(13)  Q.   --- with Nancy's Restaurant?

(14)  A.   Yeah.

(15)  Q.   Okay. Would he ever – I take it that there –

(16)  strike it.

(17)  Has Nancy's Restaurant been involved in any zoning

(18)  disputes or, you know, disputes with the zoning board or ---

(19)  A.   Yes.

(20)  Q.   --- town council?

(21)  A.   Yeah.

(22)  Q.   Okay. When has that happened?

(23)  A.   Many times. When I was building the second floor,

(24)  was fighting the neighbors, and Doug helped me to deal with

(25)  all the politics, of those politics. There's a lot of

Page 71

(1)   times. We were playing music outside, I'm fighting with the

(2)   neighbors. You know, every year I got something with the

(3)   neighbors.

(4)   Q.   Okay. When you say Mr.Abdelnour was helping you

(5)   with the politics, what did you mean by that?

(6)   A.   Well, he dealt behalf of me, went and talked, you

(7)   know, he know the politician and he knows all the stuff, so

(8)   he dealt with them.

(9)   Q.   Okay. Would he sometimes testify at public

(10)  hearings?

(11)  A.   Yeah.

(12)  Q.   When he did so, he would do so as a manager of

(13)  Nancy's?

(14)  A.   No, wasn't a manager, as a part of Nancy, he –

(15)  nobody – town people, in general, they don't know that I'm

(16)  the owner. They think he's still the owner. But as far as

(17)  the licensing board, the town hall, everybody knows I was

(18)  the owner, and he go behalf of me, in front of the committee

(19)  or anything.

(20)  Q.   Okay. So for public consumption, Mr.Abdelnour

(21)  would hold himself out as a part owner or a partner of

(22)  Nancy's?

(23)  A.   Yeah. Whatever you want to call it.

(24)  Q.   Okay. But, in fact, you were the person that

(25)  owned 100-percent of the stock ---

Page 72

(1)   A.   Yeah.

(2)   Q.   --- in the corporation ---

(3)   A.   Yeah.

(4)   Q.   --- that controls Nancy?

(5)   A.   Yeah. Yeah.

(6)   MR. KOVACEV:   Let's mark this one 5.

(7)   (Moujabber Deposition Exhibit 5

(8)   marked.)

(9)   BY MR. KOVACEV:

(10)  Q.   Now this is a collection of documents, the first

(11)  of which is, it says: Appointment of Trustee.

(12)  A.   Yeah.

(13)  Q.   And do you recognize that, that document ---

(14)  A.   Yeah.

(15)  Q.   --- as the first page of Exhibit 5?

(16)  A.   Yes, sir.

(17)  Q.   Okay. What is it?

(18)  A.   I think here he's resign as a trustee and he's

(19)  appointing me as a trustee.

(20)  Q.   Okay. And the date of exe – when this was

(21)  executed is given as July 6th, 1994? Do you see that?

(22)  A.   Yeah.

(23)  Q.   Does this refresh your recollection as to when you

(24)  became the trustee ---

(25)  A.   Yeah.

Page 85

(1)   A    Yeah.
(2)   Q    And do they pay rent to stay there?
(3)   A    Not normally, no.
(4)   Q    Okay.
(5)   A    This is part of deal they can get, you know,
(6)   working at Nancy.
(7)   Q    Okay. Now I take it that neither Nancy's nor
(8)   Douglas Island Development Corporation pay rent to the
(9)   Abdelnour Realty Trust or the H&BFamily Realty Trust?
(10)  A    I don't think so. I don't know how they act on
(11)  the worker. I have no idea.
(12)  Q    Okay. Well, you are the president of Douglas
(13)  Island Development Corporation?
(14)  A    Yes. But, you know, the accountant handle the
(15)  books.
(16)  Q    Okay. So sitting here today you don't know one
(17)  way or the other whether ---
(18)  A    No. I don't think so. No. No rent paid.
(19)  Q    Okay.
(20)  A    To that Abdelnour Realty Trust or H&BRealty
(21)  Trust.
(22)  Q    Okay. Have you ever discharged any duties as a
(23)  trustee of either of those trusts?
(24)  A    Say it again.
(25)  Q    Like have you ever discharged any duties, like are

Page 86

(1)   you aware of any obligations or duties that you particularly
(2)   have as a trustee?
(3)   A    Yeah.
(4)   Q    Like what?
(5)   A    Well, keeping good faith and pay the mortgages,
(6)   take care of the property, you know. I don't have to do
(7)   anything, you know.
(8)   Q    Okay. But I take it you're 100-percent
(9)   beneficiary of both H&BFamily Realty Trust ---
(10)  A    Yeah.
(11)  Q    --- Abdelnour Realty Trust?
(12)  A    Yeah.
(13)  Q    So as far as like doing an annual report to
(14)  beneficiaries, you don't have to report to yourself, because
(15)  you ---
(16)  A    Yeah, I have to fill out that piece of paper.
(17)  Q    Okay. But you do fill out that piece of paper?
(18)  A    Yeah. Yeah.
(19)  Q    As a trustee?
(20)  A    Yeah. Yeah.
(21)  Q    Okay. In terms of Mr.Abdelnour's financial
(22)  condition in the early Nineties who would know about that,
(23)  who would be able to testify about that?
(24)  A    I couldn't tell you. I know early Nineties, early
(25)  Eighties he was a millionaire. But I got there in the wrong

Page 87

(1)   time myself.
(2)   Q    Yeah. Well, do you know what happened to his
(3)   millions then?
(4)   A    No. Lost in cars and stupid things.
(5)   Q    But, you know, by the time you came in the – it
(6)   was clear that ---
(7)   A    Well, no. First couple of years was some solid.
(8)   Q    Okay. And then did something change suddenly?
(9)   A    All I stayed in the summertime. Wintertime, I'm
(10)  gone, so I have no idea what. You know, when I come in the
(11)  summertime, was everything good. Until he told me, don't
(12)  buy anything. Then I had to worry.
(13)  Q    Okay. When that happened, that conversation, you
(14)  know, where he told you not to buy anything, did you get the
(15)  impression that he was broke?
(16)  A    Yeah.
(17)  Q    Okay. And did that impression continue after
(18)  that?
(19)  A    I know there's a problem there.
(20)  Q    Okay.
(21)  A    There's a problem there.
(22)  Q    Okay. Financial problem ---
(23)  A    Yeah.
(24)  Q    --- that Mr.Abdelnour was having?
(25)  A    Yeah.

Page 88

(1)   Q    Okay. I think I may have asked you this, Douglas
(2)   Island Development Corporation has a – if they had a bank
(3)   account at the same institution throughout?
(4)   A    Yeah.
(5)   Q    By the same bank?
(6)   A    Yeah.
(7)   Q    Okay. And that is Edgartown?
(8)   A    Edgartown National Bank, yeah.
(9)   MR. KOVACEV:    Okay. Pass the witness.
(10)  MR. KOLDYS:    Take a brief break.
(11)  MR. KOVACEV:    Sure.
(12)  (Whereupon, a recess was taken at 12:50 p.m. to
(13)  12:51 p.m.)
(14)  MR. KOLDYS:    We have no questions.
(15)  MR. KOVACEV:    Thank you very much, Mr.Moujabber.
(16)  I appreciate you coming here. I know that you had to come
(17)  over here from the Island to the mainland so I appreciate
(18)  your cooperation.
(19)  THE WITNESS:    Thank you.
(20)  MR. KOVACEV:    And thanks, also, to counsel for the
(21)  courtesy of letting use your conference room for this.
(22)  MR. KOLDYS:    No problem at all.
(23)  MR. KOVACEV:    Okay. Thanks.
(24)  (Whereupon, at 12:52 p.m., the deposition was
(25)  concluded.)

BSA    DEPO-Joseph G. Moujabber, 4/10/2007    XMAX(23/23)

Page 89

(1)    C E R T I F I C A T E

(2)    COMMONWEALTH OF MASSACHUSETTS )
        ) SS.

(3)    COUNTY OF SUFFOLK )

(4)    I, Rosemary Gormley, a Court Reporter and Notary

(5)    Public, within and for the Commonwealth of Massachusetts, do

(6)    hereby certify that there came before me on this 10th day of

(7)    April, 2007, the person hereinbefore named, who was by me

(8)    duly sworn to tell the truth, the whole truth, and nothing

(9)    but the truth, concerning and touching the matter in

(10)   controversy in this cause; that he was thereupon examined

(11)   upon his oath, and his examination reduced to typewriting,

(12)   under my direction, and that this deposition transcript is a

(13)   true and accurate record of the testimony given by the

(14)   witness.

(15)   I further certify that I am not related to any of

(16)   the parties hereto or their counsel, and that I am in no way

(17)   interested in the outcome of said cause.

(18)   Dated at Boston, Massachusetts, this 23rd day of

(19)   April, 2007.

(20)

(21)

        Rosemary Gormley

(22)   NOTARY PUBLIC

        My Commission Expires:

(23)   November 2, 2012

(24)

(25)

Page 91

(1)    SIGNATURE OF WITNESS:

(2)    I have read the foregoing transcript and the same

(3)    contains a true and accurate recording of my answers to the

(4)    questions therein set forth, subject to the change and/or

(5)    correction sheet(s) attached.

(6)

(7)

(8)

(9)    Deponent

(10)

(11)

(12)

(13)

(14)

(15)

(16)

(17)

(18)

(19)

(20)

(21)

(22)

(23)

(24)

(25)

Page 90

(1)    CORRECTION SHEET

(2)    DEPOSITION OF JOSEPH G. MOUJABBER

(3)    PAGE NO. LINE NO. SUGGESTED CORRECTION

(4)

(5)

(6)

(7)

(8)

(9)

(10)

(11)

(12)

(13)

(14)

(15)

(16)

(17)

(18)

(19)

(20)

(21)

(22)

(23)

(24)

(25)